UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES ASKEW,

             Petitioner,                           Hon. Paul L. Maloney

v.                                          Case No. 1:06-CV-708

THOMAS PHILLIPS,

             Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Askew's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Askew's petition be **denied**.


## BACKGROUND

On June 13, 1998, Petitioner stabbed and killed Shane Venegar after which he was convicted of second degree murder. *People v. Askew*, 2003 WL 193546 (Mich. Ct. App., Jan. 28, 2003). Petitioner's conviction was later reversed by the Michigan Court of Appeals on the grounds that Petitioner was unfairly deprived of the opportunity to testify regarding Venegar's alleged propensity for violence and, furthermore, that Petitioner's trial counsel rendered ineffective assistance by failing to present testimony from two particular witnesses. *Id.* Petitioner was

1

subsequently retried on the charge of second degree murder and several individuals testified at his jury trial.  The relevant portions of their testimony are summarized below.

**Andrea Gardner**

Gardner was Shane Venegar's mother.  (Trial Transcript, April 29, 2003, 141-42).  Venegar was 23 years of age when he was killed.  (Tr. 142).  Gardner estimated that Venegar stood five feet, eight inches tall and weighed approximately 135 pounds.  (Tr. 142).  Venegar suffered from "acute asthma" and also "limped" as a result of injuries he suffered in a 1998 automobile accident.  (Tr. 142-44).

**Dr. Yung Chun**

As of June 14, 1998, Dr. Chun, a forensic pathologist, was employed as an assistant medical examiner for Wayne County.  (Trial Transcript, April 29, 2003, 145-47).  On this date, Dr. Chun performed an autopsy on Shane Venegar.  (Tr. 147).  An external examination of Venegar's body revealed that Venegar was five feet eight inches tall and weighed 132 pounds.  (Tr. 152-53).  The doctor observed a one and one-quarter inch long stab wound in Venegar's "left upper abdomen."  (Tr. 147).  This stab wound was "at least one or two inches deep" and was consistent with having been produced by a knife or "sharp forced object."  (Tr. 149).  The stab wound Venegar suffered struck his liver and caused him to experience "very rapid blood loss."  (Tr. 149-50).  Dr. Chun also observed a defensive would at the "base of the thumb and palm" of Venegar's right hand.  (Tr. 150).

An examination of Venegar's face revealed (1) an abrasion on the tip of the nose, (2)

an abrasion between the eyebrows, (3) an abrasion on the tip of the chin, and (4) a vertically oriented laceration, one inch in length, "just below" the lower lip. (Tr. 150-51). Dr. Chun concluded that it was unlikely that these particular injuries were suffered during a fight or struggle, but were instead suffered during a "terminal fall." (Tr. 151-52). The doctor concluded that Shane Venegar died from "a single stab wound to the abdomen causing massive blood loss." (Tr. 152).

**Andrigo Cowans**

On the afternoon of June 12, 1998, Cowans accompanied Shane Venegar to Petitioner's residence. (Trial Transcript, April 29, 2003, 161-62). Cowans and Venegar entered Petitioner's residence after which Venegar and Petitioner spoke for approximately 20-30 minutes. (Tr. 162-64).

The following afternoon, Cowans, Venegar, and Cowans' girlfriend, Naja Pugh, were sitting in a vehicle when they observed Petitioner approaching them on foot. (Tr. 158-59, 165-66). Venegar stated that he wanted to speak with Petitioner "about his money" after which he exited the vehicle. (Tr. 166-67). Cowans and Pugh remained in the vehicle while Venegar and Petitioner spoke. (Tr. 167-68). Approximately five minutes later, Cowans exited the vehicle and approached Venegar. (Tr. 167-68). Cowans asked Venegar, "was everything okay," but "[t]he look on Venegar's face didn't seem like it was okay." (Tr. 168). Petitioner and Cowans then began to exchange words in response to which Petitioner removed a weapon, placed it against Cowan's head, and stated, "I'll kill you." (Tr. 168-69). Petitioner eventually withdrew his weapon and then told Venegar "he could come back [and] get his money later on that day." (Tr. 169-72). Venegar and Cowans returned to the vehicle and, with Pugh, exited the area. (Tr. 169-72).

3

The group returned to the residence that Cowans shared with Diedra Green and Tirod Williams.  (Tr. 172-73).  Later that afternoon, Cowans, Venegar, Pugh, Green, and Williams departed together in Venegar's vehicle.  (Tr. 174-75).  Venegar immediately drove to the vicinity of Petitioner's residence and parked "around the corner" from Petitioner's residence.  (Tr. 175).  Venegar exited the vehicle and encountered Petitioner across the street from Petitioner's residence.  (Tr. 175-76).  Venegar was unarmed and was not in possession of any type of weapon.  (Tr. 183).  The pair spoke outside for approximately ten minutes before entering Petitioner's residence.  (Tr. 176-77).

Cowans waited another ten minutes and then drove Green and Williams to a nearby location after which Cowans and Pugh returned to Petitioner's residence.  (Tr. 177-78).  Upon his arrival, Cowans observed Venegar "running out of the house" holding his side.  (Tr. 178-79).  Venegar was unable to get very far before collapsing on the ground.  (Tr. 179).  Cowans approached Venegar and observed "a whole lot of blood."  (Tr. 179).

**Diedra Green**

On the afternoon of June 13, 1998, Green, Tirod Williams, Shane Venegar, Andrigo Cowans, and Naja Pugh were all gathered at Green's residence.  (Trial Transcript, April 30, 2003, 8-11).  Venegar was present to get his hair cut and in the process removed his shirt revealing that he did not possess any weapon, gun, or knife.  (Tr. 11).  Later that afternoon, Venegar drove the group to the vicinity of Petitioner's residence.  (Tr. 11-16).  Upon seeing Petitioner, Venegar exited the vehicle and began speaking with Petitoner.  (Tr. 13-15).  It appeared that Venegar and Petitioner were getting angry at which point Cowans exited the vehicle.  (Tr. 15-16).  Cowans approached

4

Venegar, who instructed Cowans to "get back in the car." (Tr. 15-16). Shortly thereafter, Petitioner and Venegar entered Petitioner's residence. (Tr. 16-17). Venegar was not armed with any sort of weapon. (Tr. 18). Green departed the area, but returned a short time later at which point she observed Venegar "laying on the grass. . .bleeding." (Tr. 18-22).

**Tirod Williams**

On the afternoon of June 13, 1998, Williams, Diedra Green, Shane Venegar, Andrigo Cowans, and Naja Pugh were all gathered at Williams' residence. (Trial Transcript, April 30, 2003, 30-33). Pursuant to having his hair cut, Venegar removed his shirt revealing that he did not possess any sort of weapon. (Tr. 33). The group later proceeded to the vicinity of Petitioner's residence. (Tr. 33-37). Venegar stopped near Petitioner's residence and exited the vehicle. (Tr. 35-37). Venegar approached Petitioner and the two began speaking. (Tr. 37). A short time later, Cowans exited the vehicle and approached approached Venegar, who instructed Cowans to "get back in the car." (Tr. 38). A few moments later, Petitioner, who had removed his shirt, and Venegar, who was unarmed, entered Petitioner's residence. (Tr. 39-42). Williams departed the area, but returned a short time later and observed Venegar outside "holding his stomach like he had been shot or stabbed." (Tr. 39-40).

**William Narhos**

As of June 13, 1998, Narhos was employed as a City of Detroit police officer, assigned to the "evidence tech unit." (Trial Transcript, April 30, 2003, 55-56). At approximately 7:00 p.m. that evening, Officer Narhos traveled to Petitioner's residence to investigate a possible

5

homicide.  (Tr. 55-57).  Officer Narhos observed blood on the sidewalk leading up to Petitioner's residence.  (Tr. 74).  Narhos also recovered an "inhaler" from the sidewalk leading to the residence. (Tr. 73-75).  At the entrance to the residence, Officer Narhos observed that the glass in the storm door was broken and blood stained.  (Tr. 68).  Inside the residence, Narhos recovered a loaded firearm and ammunition.  (Tr. 69-72).  Narhos searched the residence for a knife, but was unsuccessful.  (Tr. 75-76).

**Phillip Rodriguez**

As of June 13, 1998, Rodriguez was employed as a police officer for the City of Detroit.  (Trial Transcript, April 30, 2003, 85).  At approximately 5:20 p.m. that afternoon, Rodriguez was dispatched to Petitioner's residence to investigate a "shooting."  (Tr. 85).  Upon arriving, Officer Rodriguez observed Shane Venegar laying on the sidewalk nearby.  (Tr. 85-86). Rodriguez could observe that Venegar had suffered an abdominal wound that was "bleeding severely."  (Tr. 86).  Venegar was unarmed.  (Tr. 86).  Rodriguez's partner, Ronald Thomas, remained with Venegar while Rodriguez proceeded to Petitioner's residence.  (Tr. 87-88).

As he approached Petitioner's residence, Rodriguez observed that the front door was open and the glass in the screen door was broken.  (Tr. 88-89).  Officer Rodriguez searched the residence for other individuals, but the residence was unoccupied.  (Tr. 89-91).  Immediately thereafter, Petitioner returned to his residence. (Tr. 91-92).  Officer Rodriguez immediately noticed blood on Petitioner's shoes. (Tr. 92-93).  After receiving a communication regarding the description of Venegar's assailant, Rodriguez placed Petitioner under arrest.  (Tr. 93).  Officer Rodriguez observed that Petitioner was uninjured.  (Tr. 93).  Rodriguez later encountered Andrigo Cowans and

Naja Pugh. (Tr. 95). Investigation revealed that the vehicle in which they were riding was registered to Willard Prat. (Tr. 99-100).

**Willard Prat**

Prat had a close relationship with Shane Venegar. (Trial Transcript, April 30, 2003, 102-03). On or about June 13, 1998, Prat gave Venegar permission to use his vehicle for several days. (Tr. 103-04).

**Ronald Thomas**

As of June 13, 1998, Thomas was employed as a City of Detroit Police Officer. (Trial Transcript, April 30, 2003, 108). Thomas accompanied Officer Rodriuguez to Petitioner's residence that afternoon to investigate a "shooting." (Tr. 108-12).

**Barbara Simon**

As of June 13, 1998, Simon was employed as an Investigator with the City of Detroit Police Department. (Trial Transcript, April 30, 2003, 120). At approximately 10:00 p.m. that evening, Simon met with Petitioner at the police station. (Tr. 120-35). Petitioner was informed of his *Miranda* rights. (Tr. 127-35). After acknowledging that he understood his rights, Petitioner agreed to waive his right to remain silent and speak with Simon. (Tr. 127-35). Petitioner provided the following version of events to Investigator Simon.

Earlier that day Petitioner encountered Shane Venegar and another man. (Tr. 135). Petitioner and Venegar were arguing about money at which point Petitioner "pulled [his] gun out

7

and pointed the gun at [Venegar] and the other guy." (Tr. 135). Petitioner then returned to his residence. (Tr. 135). Approximately 90 minutes later, Venegar entered Petitioner's residence and demanded that Petitioner pay him his money. (Tr. 135-37). Petitoner then "grabbed" Venegar who immediately "slapped" Petitioner. (Tr. 136). Petitioner stated that "it looked like [Venegar] was for reaching for something," at which point Petitioner "pulled [his] knife out of [his] right back pocket and stabbed [Venegar] in the stomach." (Tr. 136). Petitioner acknowledged that he "never" observed Venegar with a weapon. (Tr. 136).

**Mannix Kroma**

As of June 13, 1998, Kroma was employed as a police officer for the City of Detroit. (Trial Transcript, May 1, 2003, 23). At approximately 5:20 p.m. that afternoon, Kroma was dispatched to the vicinity of Petitioner's residence to investigate a reported shooting. (Tr. 23-24). After arriving at the scene, Officer Kroma observed Shane Venegar laying in the grass "bleeding from the stomach." (Tr. 24-25). Kroma thereafter entered Petitioner's residence where he encountered Petitioner. (Tr. 25-27). Upon seeing Officer Kroma, Petitioner just blurted out, "I did it. I ain't scared. He said he was going to blow up my head." (Tr. 27-28, 35-36). Petitioner indicated that Venegar "came to the door and said, 'where is the money?'" (Tr. 28). Petitioner stated that he opened the door for Venegar to enter. (Tr. 29). According to Petitioner, after entering his residence, Venegar "swung at" him at which point Petitioner "reached in [his] rear pocket and grabbed the knife and stabbed him." (Tr. 28). Officer Kroma testified that he was not asking Petitioner any questions at this point, but that instead Petitioner was "just talking to himself." (Tr. 36). Petitioner did not make any comments indicating that Venegar was armed. (Tr. 31). Kroma

also observed that Petitioner was not wearing a shirt.  (Tr. 34).

**Fred Hamilton III**

Hamilton was a friend and neighbor to Petitioner.  (Trial Transcript, May 1, 2003, 40-41).  On the afternoon of June 13, 1998, Hamilton overheard an argument taking place at Petitioner's residence between Petitioner and Shane Venegar.  (Tr. 41-42).  Hamilton could not hear Venegar, but heard Petitioner getting a "little loud." (Tr. 41-42).  Petitioner was "cussing and telling [Venegar] to get out of his house."  (Tr. 42).  Shortly thereafter, Venegar exited Petitioner's residence "holding his side."  (Tr. 42).  Hamilton attempted to help Venegar until paramedics arrived.  (Tr. 42-45).

**Lamar Venson**

As of June 13, 1998, Venson was 13 years old.  (Trial Transcript, May 1, 2003, 64). At approximately 5:30 p.m. that afternoon, Venson observed "a car pull up" outside Petitioner's residence.  (Tr. 65).  Two or three of the occupants exited the vehicle and "walked in the house." (Tr. 65).  Venson later heard Petitioner "yelling, get out of my house." (Tr. 65).  Approximately five minutes later, "they all come outside. . went back to the car, reached in the car, came back to the house, [and] started bashing the windows and the door."  (Tr. 65).  Venson then heard a gunshot after which Shane Venegar exited the house. (Tr. 65).  On cross-examination, Venson conceded that he was unsure of the sequence of events he described.  (Tr. 69).  Venson further conceded that when he spoke with the police immediately following the events in question, he did not relate to them the version of events to which he testified on direct examination.  (Tr. 71).

Following the presentation of evidence, the jury found Petitioner guilty of voluntary manslaughter and Petitioner was subsequently sentenced to serve 3-15 years in prison.  Petitioner's conviction was affirmed on direct appeal by the Michigan Court of Appeals.  *People v. Askew*, 2005 WL 473609 (Mich. Ct. App., Mar. 1, 2005).  The Michigan Supreme Court subsequently denied Petitioner's motion for leave to appeal.  *People v. Askew*, No. 128531, Order (Mich., Oct. 31, 2005).

Petitioner initiated the present action on September 29, 2006.  On March 6, 2007, the Court stayed this matter to permit Petitioner to return to state court to pursue additional claims for relief.  On August 20, 2007, Petitioner's motion for relief from judgment was denied by the trial court.  *People v. Askew*, Case No. 98-007542, Opinion and Order (Wayne Cnty. Cir. Ct., Aug. 20, 2007).  Petitioner appealed the matter without success to the Michigan Court of Appeals and Michigan Supreme Court.  (Dkt. #29, Exhibit E).  On August 12, 2009, Petitioner, having completed his pursuit of relief in state court, filed an amended petition for writ of habeas corpus in this Court.  (Dkt. #28).  On August 26, 2009, the Court reopened this matter and ordered that Askew's petition be served on Respondent.  (Dkt. #31).

On February 18, 2010, Respondent moved for summary judgment on the ground that because Petitioner failed to comply with the Court's previous Order staying this matter, the statute of limitations expired prior to the August 12, 2009 filing of Askew's amended petition.  (Dkt. #35).  On May 26, 2010, the undersigned recommended that Respondent's motion be denied.  (Dkt. #41).  The Honorable Paul L. Maloney rejected this recommendation and dismissed Askew's petition.  (Dkt. #46-47).  On May 17, 2011, the Sixth Circuit reversed this determination and remanded the matter to this Court for further proceedings.  (Dkt. #54).  The case was subsequently reopened and

counsel appointed to represent Petitioner.  In his amended petition, Askew asserts the following claims:

I.      Petitioner's constitutional rights were violated by the introduction into evidence of statements obtained in violation of Petitioner's Miranda rights.

II.     Federal law requires reversal of Petitioner's conviction where Petitioner was denied the right to present a defense and the right to a full and fair trial.

III.    Petitioner was denied the right to a fair trial by prosecutorial misconduct.

IV.     Petitioner's conviction was based on insufficient evidence thereby violating his right to due process.

V.      Petitioner was denied the right to the effective assistance of trial counsel.

VI.     Petitioner was denied the right to the effective assistance of appellate counsel.

VII.    Petitioner was denied the right to a fair trial due to cumulative error.

It is not clear to the Court whether Petitioner is still in custody regarding the conviction challenged herein.  Generally, a petition for habeas corpus is rendered moot when the petitioner is released from custody unless the petitioner can demonstrate some "concrete and continuing injury."  *See Ruggles v. Michigan Department of Corrections*, 2011 WL 1812206 at *7 (E.D. Mich., May 12, 2011) (quoting *Spencer v. Kemn*, 523 U.S. 1, 7 (1998)).  "Ordinarily, a habeas petition challenging a criminal conviction will not be moot, because the criminal conviction almost always carries continuing collateral consequences."  *Ruggles*, 2011 WL 1812206 at *7.  Given that

Petitioner is challenging the constitutionality of his conviction, the Court finds, based on the evidence and pleadings presently before the Court, that even if Petitioner is no longer in custody his petition for habeas corpus is not moot.

## STANDARD OF REVIEW

Askew's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state

13

court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

14

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Cumulative Error

Petitioner asserts that his right to a fair trial was violated by "cumulative error." As the Sixth Circuit has made clear, however, habeas relief cannot be premised upon an alleged accumulation of errors. *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"); *see also*, *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (same). Accordingly, this claim is rejected.

### II.        *Miranda* Rights

As noted above, Barbara Simon testified as to statements Petitioner made to her during her interview of Petitioner. Petitioner asserts that his right to a fair trial was violated by the admission of these statements. The Court disagrees.

Statements made by a criminal defendant "during a custodial interrogation" are

15

inadmissible at that defendant's criminal trial "unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [his] *Miranda* rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). Determining whether an individual waived his *Miranda* rights is a two-fold inquiry. First, any waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, any waiver must be made "with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83. However, the prosecution "does not need to show that a waiver of *Miranda* rights was express," as an "implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." *Id.* at 384. Accordingly, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

Prior to his initial trial, Petitioner moved to suppress the statements he made to Barbara Simon on the ground that he did not knowingly and voluntarily waive his right to remain silent. (Dkt. #72). Specifically, Petitioner argued that despite signing a waiver of rights form, his statements to Simon should be suppressed as he was unable to read the waiver of rights form because he was not wearing corrective eyeglasses. (Dkt. #72 at 103-04). The trial court conducted a suppression hearing.

Barbara Simon testified at the suppression hearing that before interviewing Petitioner, she advised him of his *Miranda* rights. (Dkt. #72 at 15-16). Specifically, Simon testified that she asked Petitioner "if he could read and write," to which he responded, "he could." (Dkt. #72 at 16). Simon then presented Petitioner with a form detailing his various *Miranda* rights. (Dkt. #72 at 16).

Petitioner read aloud each of the rights detailed on the form after which he acknowledged his understanding both verbally and by signing his initials. (Dkt. #72 at 16, 23-26). After reading the entire form, Simon asked Petitioner to "sign his name stating that he understood and read his constitutional rights," which Petitioner did. (Dkt. #72 at 26). Simon testified that she did not threaten Petitioner or promise him anything to secure his cooperation. (Dkt. #72 at 17). Simon further testified that Petitioner did not appear at the time to be under the influence of any drugs or alcohol. (Dkt. #72 at 17).

Petitioner also testified at the suppression hearing, asserting that Barbara Simon never advised him of his *Miranda* rights. (Dkt. #72 at 70-71). Petitioner also denied reading the form describing his *Miranda* rights. (Dkt. #72 at 71). Petitioner testified that he was "unable to read without glasses." (Dkt. #72 at 71). Petitioner acknowledged signing the form describing his *Miranda* rights, however, stating that he signed the form simply to appease Simon. (Dkt. #72 at 72). Petitioner also acknowledged that while he was in jail awaiting trial he submitted to the court a handwritten letter. (Dkt. #72 at 88). Petitioner conceded that at the time he wrote this letter he was not in possession of corrective eyeglasses. (Dkt. #72 at 88).

Petitioner's motion to suppress was denied. In denying Petitioner's motion, the court concluded that Petitioner had, in fact, been fully informed of his *Miranda* rights and that Petitioner's decision to waive his rights and speak with Simon was voluntary. (Dkt. #72 at 104-06). With respect to Petitioner's allegations of deficient eyesight, the court observed that Petitioner, who acknowledged not having eyeglasses while in jail, was nevertheless able to write neat and clear letters to the court while in jail awaiting trial. (Dkt. #72 at 104-06).

Following his initial conviction for second degree murder, Petitioner raised this issue

17

on appeal.  While Petitioner's conviction was reversed on other grounds, as noted above, the Michigan Court of Appeals rejected this particular argument, finding that Petitioner "voluntarily waived his *Miranda* rights."  *Askew*, 2003 WL 193546 at *8.  At the outset of Petitioner's second trial, the trial court foreclosed further argument by Petitioner on the subject on the ground that the court was bound by the decision of the Michigan Court of Appeals that Petitioner voluntarily waived his *Miranda* rights.  (Dkt. #89 at 8-10).

In the present action, Petitioner simply reiterates the arguments that he raised in state court, namely that he was unable to read the advice of rights form due to deficient vision.  The Michigan courts rejected this particular claim.  In light of the authority and evidence identified above, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.            Right to Present a Defense

At the beginning of the second day of his second trial, Petitioner asserted that he had previously filed a motion to compel discovery which was never ruled upon.  (Dkt. #90 at 6-7).  Specifically, Petitioner asserted that he previously sought to obtain an order compelling the State to perform blood testing of the shirt he was wearing during his encounter with Shane Venegar.  (Dkt. #90 at 7).  Petitioner sought to demonstrate that the blood on his shirt was his and not Venegar's as such would support his self-defense theory.  (Dkt. #90 at 7).  The trial court informed Petitioner that such a motion had never before been properly presented.  (Dkt. #90 at 8-9).  The court observed that

18

it was simply not possible to obtain DNA testing of the shirt given the untimeliness of Petitioner's request.  (Dkt. #90 at 10-11).  The prosecutor indicated, however, that "blood typing" analysis "would be a quicker process."  (Dkt. #90 at 11).  At this juncture, the court directed the prosecutor to determine whether the shirt in question was in the State's possession.  (Dkt. #90 at 11).

At the outset of proceedings the following morning, the prosecutor informed the court that the shirt in question was still being held as evidence.  (Dkt. #91 at 4).  The prosecutor further indicated, however, that the police lab no longer performed blood typing analysis given the advent of DNA testing.  (Dkt. #91 at 4).  The prosecutor indicated that if the police lab were directed to obtain the requested testing it "would have to send [the shirt] out to a private company" and that it would take five days to obtain the results.  (Dkt. #91 at 4).  The trial judge responded by informing Petitioner that if he "could get a lab who can do it overnight, I'll order it paid for by the court."  (Dkt. #91 at 6).

The following day, after the presentation of evidence, Petitioner indicated that he "might" have located an organization that could perform blood typing analysis of the shirt.  (Dkt. #92 at 89).  Petitioner requested a continuance, presumably so that the requested testing could be performed.  (Dkt. #92 at 89-93).  The trial court denied Petitioner's "last minute" request.  (Dkt. #92 at 93-94).  Petitioner asserts that his right to present a defense was violated by his inability to present evidence regarding the analysis of the blood on his shirt.

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense."  *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the

19

criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385 Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).  As the Supreme Court has recognized, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006); *see also*, *Geisen*, 612 F.3d at 495; *United States v. Armstrong*, 2011 WL 3792363 at *4 (6th Cir., Aug. 26, 2011).

Accordingly, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve." *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308).  As is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90.

An evidentiary ruling violates a defendant's right to present a defense only where "the exclusion of evidence seriously undermined fundamental elements of the defendant's defense

20

against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315-17).  Accordingly, whether the exclusion of the evidence in question violated the defendant's right to present a defense "depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that otherwise did not exist." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006).

As Respondent observes, Petitioner's claim is based upon nothing but speculation as Petitioner has never since sought or obtained testing of the shirt in question.  Thus, Petitioner simply cannot establish that the court's failure to grant him a continuance deprived him of the opportunity to obtain evidence that would have undermined the State's case against him. Petitioner's claim is also undermined by the evidence that Petitioner removed his shirt immediately before his encounter with Venegar and, furthermore, suffered no injuries as a result of the encounter. The Michigan Court of Appeals denied Petitioner's claim regarding this issue as follows:

> Defendant now argues that the trial court abused its discretion in denying his request for a continuance, claiming that he was thereby effectively denied his constitutional right to assert a defense. However, we discern no abuse of discretion under the circumstances.
>
> First, we note that any negligence in not timely requesting a continuance is attributable to defendant.  As the prosecution notes, despite the fact that defendant (at his own behest) requested that the blood on his shirt be tested in October 2002, while his first appeal was pending in this Court, this issue was not raised or mentioned again during either of the two pretrial conferences in February 2003. Under the circumstances, the trial court properly concluded that defendant or his attorney should have informed the court at an earlier date about the possibility of blood tests.  The delay was crucial because, as noted, the resultant delay required that the shirt be sent to a private firm with a prolonged testing period.
>
> Further, we disagree with defendant's characterization of this claim as one of constitutional dimension, i.e., denial of his constitutional right to present a defense.  On the contrary, at trial, defendant had the

opportunity to fully develop his self-defense theory through the testimony of witnesses,[FN2] and the record indicates that his trial counsel effectively advanced the self-defense theory in her arguments to the jury. Moreover, defendant strategically chose not to, but could have, presented self-defense through his own testimony. Instead, this is, at most, a nonconstitutional evidentiary issue involving defendant's belated attempt to test evidence that had been available since the initiation of the case against him in 1998. Indeed, although defendant alleges on appeal that the results of the testing would reinforce his self-defense theory, such argument is mere speculation; defendant never made an offer of proof to the trial court as to what the testing would show and, apparently, has not tested the shirt since the denial of the continuance. Thus, defendant is unable to give any reliable indication on appeal whether or not a blood typing test would have bolstered his self-defense theory. Consequently, defendant has not established any prejudice from the denial of his continuance because he has not shown that the testing would have even supported his self-defense theory and that denial of a continuance forced him not to testify at trial.

> FN2. These witnesses testified as to prior confrontations with the victim and the fact that defendant repeatedly, but unsuccessfully, asked Venegar to leave his house immediately before the stabbing.

Moreover, while there were no eyewitnesses to the altercation between defendant and Venegar, there was testimony that defendant took his shirt off before he entered his home and stabbed the victim. Several officers testified that they did not notice any injuries on defendant, and defendant did not bring the alleged injury to anyone's attention. One Detroit police officer who reported to the scene found the victim lying on the sidewalk and testified as to defendant's excited utterances. This officer also testified that defendant was not wearing a shirt and had no injuries when he encountered him in the living room. Additionally, a Detroit police investigator testified that pictures were taken of defendant with his shirt off at the police station, and the investigator did not believe that defendant was wearing a shirt when she arrived. The investigator testified at trial that she recalled no injuries on defendant, and that if suspects or witnesses do present with injuries, the injuries are photographed by evidence technicians. The investigator further testified that she did not order that tests be conducted on the shirt because defendant had no injuries.

22

> In his statement to police, defendant explained that, approximately an hour to an hour and a half after an earlier confrontation with the victim, he and Venegar were alone inside defendant's house and again started arguing over whether defendant owed Venegar some money. Defendant grabbed Venegar; Venegar slapped defendant and said "the house is ours." Defendant stated that it looked like Venegar was reaching for something, so defendant pulled a knife from his back pocket and stabbed Venegar once in the stomach. Significantly, defendant, in his confession, stated that he never saw Venegar with a weapon: "No, I never seen a weapon, even when he was laying on the ground, I never saw a weapon." Moreover, defendant, in his statement, never mentioned that the victim had cut or injured him in any manner. Therefore, on the basis of this record, we conclude that the error, if any, in the trial court's denial of a continuance was harmless and would not have changed the outcome of the trial.

*Askew*, 2005 WL 473609 at *2-3.

In light of the authority and evidence identified above, the Court concludes that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.         Prosecutorial Misconduct

Petitioner next asserts that he is entitled to relief because the prosecution presented knowingly perjured testimony from an unidentified "police officer." Petitioner has failed to identify in his petition the identity of the officer in question or the testimony that forms the basis of this claim. However, a review of Petitioner's state court pleadings indicates that Petitioner is challenging certain testimony provided by Officer Mannix Kroma.

As noted above, Mannix Kroma testified at Petitioner's second trial that he was

23

dispatched to investigate the encounter between Petitioner and Shane Venegar. Kroma testified that he entered Petitioner's residence after which Petitioner made various statements. As Petitioner observes, at Petitioner's initial trial Officer Kroma presented a different version of events. Specifically, Kroma testified that while he arrived at Petitioner's residence to investigate the stabbing of Shane Venegar, he only briefly entered Petitioner's residence and did not encounter Petitioner therein. (Dkt. #76 at 242).[1] Petitioner asserts that the apparent inconsistency in this testimony demonstrates that the prosecutor engaged in misconduct entitling him to habeas relief.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219). Thus, even if the challenged conduct was improper, habeas relief is available only where the conduct was "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

---

[1] Petitioner also argues that the testimony Officer Kroma provided at the suppression hearing was likewise contrary to the testimony he offered at the second trial. (Dkt. #72 at 44-59). The issue at the suppression hearing, however, was limited to the question whether Petitioner had been informed of (and subsequently waived) his *Miranda* rights. Relevant to this particular inquiry was Officer Kroma's testimony concerning events following Petitioner's arrest, not necessarily the events that allegedly occurred when Kroma initially entered Petitioner's residence. Thus, while Officer Kroma's testimony at the suppression hearing may not have paralleled his subsequent trial testimony, given the distinctly different nature of the two proceedings it is not apparent that Officer Kroma's testimony at the suppression hearing was inconsistent with or contrary to his subsequent testimony at Petitioner's second trial.

24

The knowing presentation by a prosecutor of perjured testimony would certainly warrant habeas relief.  *See Peoples v. Lafler*, 734 F.3d 503, 515 (6th Cir. 2013).  As the *Lafler* court observed:

> The Supreme Court has long recognized that due process is denied where [the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.  Deliberate deception is incompatible with rudimentary demands of justice.

*Id.* (citations omitted).

The Sixth Circuit has developed a three-part test to assess whether a criminal defendant suffered a deprivation of due process through the introduction of false testimony.  To demonstrate that he is entitled to relief, Petitioner must establish: (1) the challenged testimony was "actually false;" (2) the testimony was "material;" and (3) the prosecution "knew it was false."  *Id.* at 515-16.  Testimony is material "only if there is a reasonable likelihood that it affected the judgment of the jury."  *Id.* at 516.

Even if the Court assumes that the testimony in question was material, Petitioner has failed to demonstrate that the testimony was actually false or that, even if such was the case, that the prosecutor knew the testimony was false.  At most, Petitioner has demonstrated an inconsistency in Officer Kroma's testimony, something which his attorney had an opportunity to explore on cross-examination.  With respect to this claim, the Michigan Court of Appeals concluded:

> A prosecutor may not knowingly use false testimony to obtain a conviction and has a duty to correct false evidence.  Here, however, the record indicates that while the inconsistencies-minor, if any-between the officer's trial testimony and his prior statements could, and did, serve as the basis for impeachment by defense counsel, they were not tantamount to prosecutorial misconduct based on the knowing introduction of false testimony.  Because defendant's

25

> claim is meritless, his related argument that defense counsel was
> ineffective in failing to object or properly cross-examine Officer
> Kroma is similarly without basis in the record.

*Askew*, 2005 WL 473609 at *8.

In light of the authority above and evidence of record, the Court concludes that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.        Sufficiency of the Evidence

Petitioner asserts that there did not exist sufficient evidence to convict him of voluntary manslaughter. Specifically, Petitioner asserts that his conviction is unlawful because "much of the evidence on which the verdict presumptively rested occurred outside of the Petitioner's dwelling prior to the use of DEADLY FORCE, and the arrival of police to the scene."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its

judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Michigan law has long defined manslaughter as "murder without malice." *People v. Mendoza*, 664 N.W.2d 685, 689 (Mich. 2003) (citing *People v. Potter*, 5 Mich. 1, 6 (1858)). As of June 13, 1998, an individual was guilty of voluntary manslaughter if the following elements were satisfied: (1) the defendant killed in the heat of passion; (2) the passion was caused by adequate provocation; and (3) there was not a lapse of time sufficient for a reasonable person to control his passions. *See People v. Arbuckle*, 1997 WL 33344405 at *1 (Mich. Ct. App., July 22, 1997). Adequate provocation is "provocation that would cause a reasonable person to lose control and act out of passion rather than reason." *People v. Wiggins*, 1997 WL 33353472 at *1 (Mich. Ct. App., Feb. 25, 1997).

Petitioner's argument is essentially that the jury should have interpreted and weighed the evidence differently than it did. Such is not a basis for habeas relief, however. Instead, to obtain relief, Petitioner must demonstrate that no rational trier of fact could have found him guilty beyond a reasonable doubt. The evidence, viewed in a light most favorable to the prosecution, is sufficient for a rational person to conclude that Petitioner was provoked by Shane Venegar and that Petitioner acted in the heat of passion without time to first control his passions. Moreover, the evidence was sufficient for a rational person to conclude that Petitioner did not act in self-defense. The Michigan Court of Appeals rejected this particular claim, stating as follows:

Defendant argues that, had he testified at this trial as he had at the first trial, and had "the jury had the opportunity to consider defendant's self-defense claim based on all of the available evidence defendant should have presented," defendant would have been acquitted. Defendant asserts that Cowans' testimony was incredible, in contrast with defendant's testimony which presented a credible theory of complete self-defense. Defendant asserts that the jury's verdict likely represented a compromise, and "[h]ad the jury heard the testimony [defendant] gave in the first trial, even without Tracy Jackson's testimony, it is very likely the jury would have acquitted him."

Defendant does not address the evidence presented at this trial but, rather, addresses all of the "evidence" known to defendant, including his own prior testimony and the potential testimony of Tracy Jackson, which was unobtainable but purportedly would have corroborated defendant's prior testimony concerning the victim's propensity for violence. In effect, defendant does not actually argue that the evidence presented against him at his second trial was insufficient to support the verdict; rather, defendant argues that had *different* evidence been presented, the jury would have found that he acted in self-defense and would have acquitted him. As discussed above, "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." Defendant's stated basis for his sufficiency of the evidence claim is without merit.

In any event, there was sufficient evidence presented at trial to allow a rational trier of fact to find that the essential elements of voluntary manslaughter were proven beyond a reasonable doubt and that defendant did not act in self-defense. As previously noted, in his statement to police, defendant indicated that he stabbed Venegar after Venegar threatened him and slapped him and that he never saw Venegar with a weapon. This was sufficient to allow the jury to find that defendant killed Venegar intentionally and without malice, but in the heat of the moment and without deliberation and reflection, as well as to conclude that defendant did not have a reasonable and honest fear of imminent death or serious injury when he stabbed Venegar. We conclude that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find that the essential elements of the crime were proven beyond a reasonable doubt.

*Askew*, 2005 WL 473609 at *7.

In light of the authority above and the evidence of record, the Court concludes that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.            Ineffective Assistance of Counsel

Finally, Petitioner asserts that he is entitled to habeas relief because he was denied the right to the effective assistance of trial counsel and appellate counsel.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable

29

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 131 S.Ct. at 740.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.* (citations omitted).  As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).


A.    Trial Counsel

Petitioner advances four grounds for concluding that the attorney who represented

him at his second trial rendered constitutionally deficient performance.  Petitioner asserts that his attorney: (1) failed to request a second suppression hearing; (2) failed to timely request DNA testing of the shirt he was wearing at the time of his encounter with Shane Venegar; (3) advised Petitioner not to testify; (4) failed to present expert testimony from an ophthalmologist; and (5) failed to properly cross-examine Mannix Kroma regarding his perjured testimony.

### 1.      Failure to Request a Second Suppression Hearing

With respect to counsel's failure to request a second suppression hearing, as discussed above, the trial judge who conducted Petitioner's second trial ruled that a second suppression hearing was foreclosed by the decision of the Michigan Court of Appeals that Petitioner voluntarily waived his *Miranda* rights.  Thus, any request for a second suppression hearing would have been futile.  It does not constitute deficient performance to pursue futile avenues of relief. Moreover, even if the Court assumes that counsel's performance in this regard was deficient, Petitioner has failed to demonstrate that the outcome of a second suppression hearing would have produced a favorable result.  Thus, Petitioner can satisfy neither prong of the analysis.

### 2.      Failure to Timely Request DNA Testing of Petitioner's Shirt

As for counsel's failure to timely request DNA testing of Petitioner's shirt, even if the Court assumes that counsel's performance was deficient, Petitioner cannot establish that he was prejudiced thereby.  As previously noted, this claim is based on nothing more than speculation. Petitioner has never had the shirt in question tested and, therefore, cannot establish that had testing been timely requested the outcome of his trial would have been different.

3.      Counsel's Decision to Advise Petitioner not to Testify

At the close of proofs, outside the presence of the jury, Petitioner's counsel indicated to the court that she advised Petitioner not to testify in his own behalf. (Dkt. #92 at 77-78). Counsel indicated that after reviewing Petitioner's testimony from his initial trial, she determined that Petitioner's testimony "hurt his credibility rather than aided his credibility and I think the fact that the jury came back with a verdict of guilty to murder two, after hearing him testify and explain his position with the optometrist, sort of supports my interpretation of that now." (Dkt. #92 at 77). Accordingly, counsel made the strategic decision to advise Petitioner not to testify. (Dkt. #92 at 77-78).

As is recognized, an attorney's strategic decisions are "virtually unchallengeable." *See United States v. Washington*, 715 F.3d 975, 982 (6th Cir. 2013) (quoting *Strickland*, 466 U.S. at 690-91). Given the substance of Petitioner's testimony from his first trial, it was not unreasonable for counsel to determine that it was wiser for Petitioner not to testify at his second trial. (Dkt. #77). Considering that Petitioner was convicted of second degree murder in the trial in which he testified and the lesser charge of manslaughter in the trial where he did not testify, it is difficult to fault counsel's strategy. Thus, Petitioner cannot establish that his counsel's strategy was deficient. Moreover, even if the Court assumes that counsel's strategy was deficient, Petitioner cannot establish that the outcome of his second trial would have been more favorable had he taken the stand and testified.

4.      Counsel's Failure to Question a Vision Specialist

Petitioner next faults his trial counsel for failing to secure the testimony of

ophthalmologist to provide expert testimony regarding Petitioner's allegedly severe vision impairment. Counsel indicated to the trial court that after reviewing the transcripts from Petitioner's first trial, she made a strategic decision not to present such testimony. (Dkt. #92 at 77-78). A review of the transcripts in question reveals that counsel's decision was not unreasonable.

Dr. Robert Kocembo testified at Petitioner's first trial that, without corrective eyeglasses, Petitioner was unable to discern facial features or read anything other than "awfully large" print. (Dkt. #76 at 208-09). When Petitioner later testified, however, he had to concede that while in jail, and without benefit of corrective eyeglasses, he wrote at least two letters to the court the penmanship of which was described as "straight and on the line." (Dkt. #77 at 85-90). It was not unreasonable for counsel to conclude that this contradictory evidence damaged Petitioner's credibility. Moreover, while Petitioner subsequently attempted to explain away this inconsistent evidence, it would not have been unreasonable for counsel to have concluded that Petitioner's attempts even further damaged his credibility. (Dkt. #77 at 91-93). In sum, counsel's strategic decision not to present expert testimony regarding Petitioner's allegedly deficient eyesight was, under the circumstances, a reasonable strategic decision which cannot form the basis for habeas relief.

5.    Failure to Effectively Cross-Examine Mannix Kroma

Finally, Petitioner asserts that, by failing to establish on cross-examination that Mannix Kroma offered perjured testimony, his counsel rendered constitutionally deficient performance. As previously noted, Petitioner has identified an apparent inconsistency in Officer Kroma's testimony. While counsel may not have approached the matter in the precise manner

Petitioner may have preferred, counsel did, in fact, broach the subject with Kroma on cross-examination.

Rather than directly challenge Officer Kroma regarding the apparent inconsistency in his testimony, counsel instead questioned Officer Kroma as to the content of the contemporaneous report he completed regarding the incident in question. (Dkt. #92 at 34-39). Counsel was able to demonstrate that certain of the items to which Kroma testified on direct examination were not contained in his contemporaneous reports. (Dkt. #92 at 34-39). While counsel may not have questioned Officer Kroma as Petitioner may have preferred, counsel's strategy as to how to cross-examine Kroma was not unreasonable. Moreover, while Petitioner asserts that Officer Kroma committed perjury, as discussed above, Petitioner has failed to establish such. In sum, Petitioner has failed to establish that counsel's performance was deficient. However, even if the Court assumes that such is the case, Petitioner has failed to demonstrate that he was prejudiced by counsel's allegedly deficient performance.

### B.    Appellate Counsel

Petitioner asserts several grounds for relief based upon the allegedly deficient performance of counsel appointed to represent him following his conviction for manslaughter following his second trial. First, Petitioner asserts that counsel was deficient for failing to assert the claims, addressed above, regarding the alleged violation of Petitioner's *Miranda* rights and trial counsel's failure to timely request DNA testing of Petitioner's shirt. As discussed above, these two claims are without merit. It is not deficient performance for counsel to fail to assert meritless claims. Moreover, even if the Court assumes that counsel was deficient for failing to assert these particular

claims, Petitioner cannot establish that he was prejudiced thereby.

Petitioner also asserts that his appellate counsel rendered constitutionally deficient performance by failing to obtain certain transcripts prior to pursuing Petitioner's appeal. Specifically, Petitioner asserts that his appellate counsel failed to request transcripts for proceedings occurring on the following dates: (1) February 7, 2003; (2) February 14, 2003; (3) February 21, 2003; (4) February 26, 2003; (5) March 7, 2003; and (6) May 2, 2003. The first five of these dates correspond to pre-trial proceedings associated with Petitioner's second trial. Petitioner has failed, however, to describe the nature of the proceedings in question, what legal claims could have been asserted with respect to such, or how he was allegedly prejudiced by counsel's failure to obtain the transcripts in question. In sum, Petitioner cannot demonstrate that even if his appellate counsel was deficient for failing to obtain and review these particular transcripts that he was prejudiced by such failure.[2]

With respect to counsel's failure to secure transcripts from the May 2, 2003 proceedings, the Court reaches the same conclusion. The presentation of evidence in Petitioner's second trial was completed on May 1, 2003. (Dkt. #92). Later that same day, closing arguments were presented and the jury was instructed and began its deliberations. (Dkt. #92). The jury's deliberations continued into the following day, May 2, 2003, and were completed that day with a finding that Petitioner was guilty of voluntary manslaughter. It is not disputed that counsel failed

---

[2] Transcripts of the proceedings on the following dates have since been secured and submitted to this Court: (1) February 21, 2003; (2) February 26, 2003; and (3) March 7, 2003. (Dkt. #86-88). On February 21, 2003, the trial court conducted a status conference to ensure that proceedings concerning Petitioner's second trial proceeded in a timely fashion. (Dkt. #86). On February 26, 2003, the trial court conducted an arraignment at which Petitioner pleaded not guilty. (Dkt. #87). On March 7, 2003, the trial court conducted a hearing on Petitioner's request for bond pending his second trial. (Dkt. #88). The Court discerns nothing in the transcripts of these proceedings that would have supported a viable claim on appeal. Transcripts for the proceedings occurring on February 7, 2003, and February 14, 2003, have not been obtained and apparently are unable to be obtained or recovered.

to obtain a copy of the transcript of the May 2, 2003 proceedings before pursuing Petitioner's appeal. It has also been established that it is no longer possible to obtain a transcript of this proceeding. (Dkt. #62, 100, 110).

Again, even if the Court assumes that Petitioner's appellate counsel rendered deficient performance by failing to obtain a transcript of the May 2, 2003 proceedings prior to pursuing Petitioner's appeal, Petitioner, to obtain habeas relief, must also establish that he was prejudiced by his attorney's failure. In this regard, Petitioner asserts that on the date in question the trial judge erroneously instructed the jury and that by failing to review the relevant transcript his appellate counsel failed to advance a meritorious claim.

Petitioner asserts that on May 2, 2003, the jury sent to the trial judge a note asking, "whose duty is it to prove self-defense?". Petitioner asserts that the trial judge improperly responded to the jury's question. Specifically, Petitioner asserts that the trial judge responded by providing the jury with Michigan Model Criminal Jury Instruction 7.22 instead of the proper instruction, Michigan Model Criminal Jury Instruction 7.20.

Michigan Model Criminal Jury Instruction 7.20 provides, in its entirety, as follows:

The defendant does not have to prove that [he/she] acted in self-defense. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense.

M. Crim. J.I. 7.20 - Burden of Proof - Self-Defense.

Michigan Model Criminal Jury Instruction 7.22 provides, in its entirety, as follows:

(1)    The defendant claims that [he / she] acted in lawful [self-defense / defense of _____]. A person has the right to use force to defend [himself / herself / another person] under certain circumstances. If a person acts in lawful [self-defense / defense of others], [his / her] actions are justified and [he / she]

is not guilty of [*state crime*].

(2)     You should consider all the evidence and use the following rules to decide whether the defendant acted in lawful [self-defense / defense of _____]. Remember to judge the defendant's conduct according to how the circumstances appeared to [him / her] at the time [he / she] acted.

(3)     First, at the time [he / she] acted, the defendant must not have been engaged in the commission of a crime.

(4)     Second, when [he / she] acted, the defendant must have honestly and reasonably believed that [he / she] had to use force to protect [himself / herself / _____] from the imminent unlawful use of force by another.  If [his / her] belief was honest and reasonable, [he / she] could act at once to defend [himself / herself / _____], even if it turns out later that [he / she] was wrong about how much danger [he / she / _____] was in.

(5)     Third, a person is only justified in using the degree of force that seems necessary at the time to protect [himself / herself / the other person] from danger. The defendant must have used the kind of force that was appropriate to the attack made and the circumstances as [he / she] saw them.  When you decide whether the force used was what seemed necessary, you should consider whether the defendant knew about any other ways of protecting [himself / herself / _____], but you may also consider how the excitement of the moment affected the choice the defendant made.

(6)     Fourth, the right to defend [oneself / another person] only lasts as long as it seems necessary for the purpose of protection.

(7)     Fifth, the person claiming self-defense must not have acted wrongfully and brought on the assault. [However, if the defendant only used words, that does not prevent (him / her) from claiming self-defense if (he / she) was attacked.]

M. Crim. J.I. 7.22 - Use of Nondeadly Force in Self-Defense or Defense of Others.

Certainly, responding to the question "whose duty is it to prove self-defense?" with Instruction 7.22 would have been incorrect. However, this instruction does not *misstate* which party bears the burden to prove self-defense. Instead, Instruction 7.22 simply fails to answer the question that the jury allegedly asked. The court's alleged response would raise concerns if it were the court's only instruction to the jury with respect to duty. However, the jury was, in fact, properly instructed that the prosecution bore the burden to prove beyond a reasonable doubt that Petitioner did not act in self-defense.

Following the presentation of evidence and closing arguments, the trial judge instructed the jury. (Dkt. #92 at 132-52). With respect to the issue of self-defense, the jury was provided Michigan Model Criminal Jury Instruction 7.15 - Use of Deadly Force in Self-Defense. (Dkt. #92 at 143-48; M. Crim. J.I. 7.15). The jury was also instructed that:

> If a person assaulted the defendant in the defendant's own home, the defendant did not have to try to retreat or get away. Under those circumstances, the defendant could stand his ground and resist the attack with as much force as he honestly and reasonably believed necessary at the time to protect himself.

(Dkt. #92 at 148; M. Crim. J.I. 7.16-7.17). Finally, the jury was instructed that:

> The defendant does not have to prove that he acted in self-defense. Instead the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self defense.

(Dkt. #92 at 148; M. Crim. J.I. 7.20).

It is important to remember that Petitioner is not challenging the jury instructions as constitutionally deficient, but is instead asserting the claim that his appellate counsel rendered constitutionally deficient performance by failing to obtain a transcript of the May 2, 2003

38

proceedings.  Even if the Court assumes that counsel's failure was deficient, Petitioner must still demonstrate that such resulted in prejudice.  In this particular context, Petitioner must demonstrate that absent counsel's alleged shortcoming "he would have prevailed on his appeal."  *Meek v. Bergh*, 526 Fed. Appx. 530, 534 (6th Cir., May 14, 2013).

The Court is not persuaded that even had counsel challenged on direct appeal the claim that the trial judge improperly responded to the jury's May 2, 2003 inquiry such would have been successful.  *See, e.g., People v. McDonald*, 1998 WL 1991097 at *1 (Mich. Ct. App., June 12, 1998) (on appeal, "jury instructions are reviewed in their entirety" and "[r]eversal is not required where the instructions, taken as a whole, sufficiently protect the defendant's rights").  The jury was properly instructed from the outset as to which party bore the burden on Petitioner's claim of self-defense and jurors are assumed to follow their instructions.  *See People v. Leonard*, 1998 WL 2016574 at *2 (Mar. 10, 1998) ("[a]s a general rule, jurors are presumed to follow their instructions").  As previously noted, even assuming the trial judge responded to the jury's question by providing Instruction 7.22, such did not misinform the jury on the question of duty, but simply failed to address the jury's question at which point the jury would have been forced to rely on the court's initial - and correct - instruction on the matter.  The Court concludes, therefore, that Petitioner cannot establish that he was prejudiced by his appellate counsel's failure to obtain a transcript of the May 2, 2003 proceedings prior to pursuing his appeal.

The Michigan courts rejected Petitioner's ineffective assistance of counsel claims. This determination was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  Furthermore, this determination was not based on an unreasonable

determination of the facts in light of the evidence presented.   Accordingly, the undersigned recommends that these claims be denied.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.   Accordingly, the undersigned recommends that Askew's petition for writ of habeas corpus be **denied**.   The undersigned further recommends that a certificate of appealability be denied.   *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  July 25, 2014                                          /s/ Ellen S. Carmody
                                                                ELLEN S. CARMODY
                                                                United States Magistrate Judge